IRVINE *v*. IRVINE.

1. HUSBAND AND WIFE—SEPARATE MAINTENANCE—DIVORCE—EVIDENCE.

Record failed to substantiate husband's claims for divorce or to justify denial of decree granting separate maintenance to wife on grounds that wife submitted to mother's influence and interference to the extent that it estranged the parties or that wife refused to discuss mutual problems of the home (CL 1948, § 552.301).

2. DIVORCE—REFUSAL OF COHABITATION—EVIDENCE.

Husband's testimony *held,* insufficient to establish ground for divorce because of the wife's unreasonable refusal to cohabit in view of a period of illness of wife and his failure to make such claim in the original bill.

3. HUSBAND AND WIFE—SEPARATE MAINTENANCE—AFFECTION OF CHILDREN.

Record in husband's suit for divorce wherein wife was granted decree of separate maintenance on her cross bill *held,* insuffi-

---

REFERENCES FOR POINTS IN HEADNOTES

[1] Generally as to grounds for decree for separate maintenance, see 27 Am Jur, Husband and Wife § 404.
[2] 17 Am Jur, Divorce and Separation §§ 75, 108.
[2] Refusal of sexual intercourse as ground for divorce. 175 ALR 708.
[5] 27 Am Jur, Husband and Wife §§ 415, 416.

cient to sustain husband's contention that wife had influenced the children, girls 11 and 12 years of age, against their father, although it does appear they have lost their affection for him (CL 1948, § 552.301).

4. SAME—SEPARATE MAINTENANCE—NONSUPPORT.

Decree of separate maintenance to wife is sustained, where husband is willing to support the wife and children only on condition that she take a vacation until the children's present attitude toward him changes to one of love and affection (CL 1948, § 552.301).

5. SAME—SEPARATE MAINTENANCE—INCOME—VALUE OF ASSETS.

Husband, in suit for separate maintenance, is ordered to pay wife $1,000 per month in addition to use of house in which the wife and 2 children were living at time of hearing in court and payment of necessary medical and/or hospital expenses for them, where he has an average net annual income, after taxes, of $22,500 and has assets totalling $300,000.

Appeal from Kalamazoo; Libbers (John G.), J., presiding. Submitted January 13, 1954. (Docket No. 29, Calendar No. 46,011.) Decided April 5, 1954.

Bill by Stuart Irvine against Elizabeth M. Irvine, originally for separate maintenance, amended to ask for divorce. Cross bill by defendant for separate maintenance. Decree for defendant. Plaintiff appeals. Affirmed.

*Sharpe, Stapleton, Huff & Adams* (*Uhl, Bryant, Slawson & Wheeler*, of counsel), for plaintiff.

*Schaberg & Schaberg,* for defendant.

KELLY, J. Plaintiff appellant (hereinafter referred to as husband) filed his bill of complaint in the Kalamazoo county circuit court on May 26, 1952, requesting a decree of separate maintenance from the defendant appellee (hereinafter referred to as wife).

On November 29, 1952, the husband amended his bill of complaint, stating that when he instituted suit for separate maintenance the previous May he had hopes "of a reconciliation and a correction of the abnormal situation existing" between himself and his wife but it became apparent that reconciliation was impossible so he prays for absolute divorce. Further, that the court decree, as prayed in his original bill:

"(b) That defendant be required to take, immediately, all reasonable action to repair the damage which has been done to the hearts of the children of said parties;

"(c) That the plaintiff be awarded immediate custody of the children of said parties with such custody to continue for such period of time as is reasonably necessary to correct the present feelings and attitude of the children toward the plaintiff and to replace the same with normal feelings of love and affection which should exist between children and their father;

"(d) That such custody include the privilege of use of the family home at 169 South Prospect street in the city of Kalamazoo, Michigan, by plaintiff and the children, with defendant being afforded opportunity to accept offers previously made and still available to provide extended vacation at plaintiff's expense for both herself and her mother, thereby affording to plaintiff reasonable opportunity for accomplishment of desired results.

"(e) That such custody of said children be continued at least until such time as the court may be convinced that the defendant has come to a realization of the fact that the best interests of the children of said parties require cooperation of the parents to the end that there be developed in the children a proper attitude of love, affection, kindness, consideration, unselfishness, and respect toward both parents."

The wife on June 18, 1952, filed her answer and cross bill praying that the court dismiss her husband's bill of complaint; that she be awarded custody of the children; and that she be granted separate maintenance.

After 4 days of trial, the court decreed on April 9, 1953, that the husband had been guilty of nonsupport in violation of CL 1948, § 552.301 (Stat Ann § 25.211) and that the wife should be awarded separate maintenance. The court in said decree also provided that the wife have custody of the children, with the provision that the husband have the right to visit them once a week at reasonable times so as not to interfere with their home or school routine, and to have the children with him on alternate week ends, alternate holidays and during half of the summer school vacation.

Husband appeals to this Court and lists the following 5 questions, which he claims are involved:

"1. Did defendant submit to her mother's influence and interference to the extent that it estranged the parties?

"2. Did the defendant influence the children against their father?

"3. Did defendant unreasonably refuse to recognize and discuss with plaintiff the mutual problems of the home?

"4. Did defendant unreasonably refuse to cohabit with plaintiff?

"5. Was plaintiff guilty of nonsupport?"

We have carefully reviewed the record in respect to question 1—mother-in-law's influence, and question 3—refusal on wife's part to discuss mutual problems of the home, and we are convinced there is nothing in the record in regard to these 2 questions to sustain the husband's request for divorce, or to justify the denial of separate maintenance to the wife.

In regard to question 4—defendant's unreasonable refusal to cohabit, we note that the husband made no such claim when he filed his original bill. We do not believe the testimony in this regard affords grounds for divorce for the husband.

There are 2 questions presented, numbers 2 and 5 above, which are, in our opinion, important and closely related.

Question 2: "Did the defendant influence the children against their father?"

At the time of the marriage, November 7, 1934, the wife was 26 years of age. She was a graduate of Kalamazoo college with a degree A.B. *cum laude,* where she specialized in child psychology, sociology and teaching and was and had been for 5 years teaching in the public schools of Kalamazoo. The husband was 37 years of age. He had inherited the business of the Saniwax Paper Company 10 months previous, and was president of the company at the time of marriage.

The parties had 2 children, Mary, who was born 6 years after marriage and who was 12 years old at the time of trial, and Georgia, who was 1 year younger.

Seven years after the marriage the husband entered the army. He states that he had a very happy married life up to that time. He was in the army for almost 3 years. He describes a change when he returned from service, stating, "When I came back permanently, there didn't seem to be a desire on her part to sort of take me into that partnership again."

The husband testified that "A very small incident led to the break between us," resulting in his leaving his home, wife and children, the evening of July 31, 1951. He stated that at the supper table that night, something was said about his daughter purchasing a new pair of jeans and when he said, "What hap-

pened to the old ones?" his wife said, "What's the matter, too tight to buy your little daughter a new pair of jeans?" and "that just made me blow up, and I packed my things and left."

Less than 90 days before this occurrence, while on a 10-day trip taken with the hope of relaxation for himself and his family, the husband, on May 4, 1951, wrote his wife, "I am going to try to forget to the utmost the problems that seem unsurmountable." He further stated: "You have so many fine qualities. These are only a few:" and then listed them in 14 paragraphs. In the first 5 paragraphs he described his wife's courage, devotion to home and children, and her remarkable job of handling financial matters while he was in the army.

He then praised his wife for her love of home; her excellent taste not only in furnishing and keeping the home but in regard to her clothes; the attractive way she dressed the children and her efforts and desire to help him in his dress to have him appear well before others. He described her great personal charm and how as a hostess she made people feel at home; he praised her unselfishness, thoughtfulness to neighbors and people in trouble, and her tolerant attitude toward his taking trips and vacations. Then he included the following paragraph, important in considering the present question:

"You are devoted to the children. You are infinitely patient with them. I am sure you believe sincerely that what you are doing with them is for their best welfare. You are wonderful with them in thinking of so many things in building their cultural background, and in creating their interest in cultural arts."

About a year before writing the above letter, the husband had his attorney draft a bill of complaint against his wife. He enclosed that bill of complaint

in the same letter of praise, with a note saying that he hoped and prayed it would never have to be filed, but he was sending it to her because she had asked him what grounds he had for taking legal action against her. He referred to paragraph 8 of that bill as "the greatest stone wall, for no marriage can succeed under such a situation." Paragraph 8 stated that the defendant refused to confer with him in regard to the family problems, and particularly in regard to correcting family difficulties relating to the children.

In his original bill of complaint filed May 26, 1952, one year after sending the above letter, the husband states:

"Plaintiff has and at all times has had a deep and sincere love for defendant and a recognition of her innumerable fine qualities despite the present tragic situation; that plaintiff believes that both the defendant and plaintiff have within each other all of the fundamental fine qualities necessary to reestablish a happy marriage with each other and to provide a happy and proper home life for the children; that the children are fundamentally normal in every way, with exceptional intelligence and capacity for love and affection, and that these elements appear to be impossible of accomplishment only because of the absence of cooperative effort on the part of defendant."

The husband does not claim that his wife was selfish or indifferent to the needs of the children or that she was concerned only with her own pleasures. His complaint is that she wore herself out doing things for her daughters that they should have been made to do for themselves. He stated in regard to his wife's trip to Florida in the winter of 1948 for her health that:

"Before Mrs. Irvine went to Florida I thought she gave them entirely too much attention, and to

the point of not giving them a chance to be self-reliant—bringing toys to them and wearing herself out. She was very attentive to them and devoted to them, but I felt that it was not only wearing her out but not giving the children a chance to be as self-reliant as they should. During this time prior to her going to Florida, I don't think the children were as respectful to either of us as most children are at that age."

During the time his wife was in Florida, the husband printed and hung on the wall a routine chart, and in regard to his 2 daughters, Mary and Georgia, it stated:

"They have to do what they are told. *Are made to mind.* If they don't and continue to buck authority, a punishment follows and they are made to do what they have been asked to do in the first place. No compromise. The fuss is short-lived and the incident soon forgotten with no ill feelings remaining."

The husband testified that from the time his wife returned from Florida in 1948 until he left the home in July, 1951, he "got along pretty well with the children." He stated that during this period he did not have the same opportunity to get close to them as he had while his wife was away and he had "little chance * * * to correct them because, frankly, it was resented on the part of my wife in taking a hand in it." He stated the children's treatment toward him up until a few months before he left home in July "was all right in most respects" but he cites incidents which convinced him that he had either lost or was losing the affection of his daughters.

The wife testified that the first 6 years of their married life, before the first daughter was born, they got along because she did everything he wanted to do, that he liked to be always on the go—vacation trips, social gatherings, et cetera. After the daughter was born she could not continue to do this and

he seemed resentful. He entered the army as a captain and was transferred from place to place but was never promoted, resulting, defendant alleges, in his returning home in a frustrated frame of mind; that he has a persecution complex and is possessed of mental aberrations and unable to adjust himself to the problems of a home and children; that he has a mania for strict discipline and has "for more than 4 years last past, been consulting and advising with psychiatrists, and has visited a mental hospital near the city of Ann Arbor."

In this regard the husband denied that he was a psychopathic individual and states that "he has been upset by the wrongful actions and attitude of the defendant and particularly in connection with the attitude which has been instilled in the children toward the plaintiff."

The husband in his reply to defendant's answer to plaintiff's amendment to bill of complaint stated:

"As to the allegation   *  ·  *   *   that the plaintiff has for more than 4 years last past been consulting and advising with psychiatrists, the plaintiff admits the same and avers that for the most part such consultations were regarding the physical and mental condition of the defendant and the abnormal marital and family relationship of the parties and the correction of the same, and the plaintiff avers that such consultations were concurred in by the defendant's own physician. The plaintiff admits that he spent 4 days in a hospital near Ann Arbor which had some mental patients and that he went there in the belief that it was a sanitarium where special attention was given to massage, baths and rest."

No medical testimony was introduced at the trial.

The wife testified that from the time her husband returned from the army "his attitude toward the children, from then on he was more and more dic-

tatorial and demanded love. He wanted love given to him as his right as a father. There wasn't any feeling that love must be merited; love must be earned. He was the head of this organization anyway and he was supposed to be respected for that."

The wife denied plaintiff's allegations that she was responsible for the children's lack of affection and love for him, and stated that she did everything within her power to bring about a proper relationship between her daughters and her husband.

The wife further stated that she tried to find a solution to the problem after her husband left the home, herself and children:

"I have tried. Since he left all I have been able to do would be to call and say, 'Don't you want to take them this place or that place?' *  *  *

"I have tried to act like he was a wholly normal father and not make a situation for the children to realize that there was one. I have put them in a home with the father and I tried to keep it a happy home with the father. I never discussed that subject with the children if I could avoid it. I tried to just act like things are right."

Plaintiff called 5 witnesses to the stand. Two of these witnesses had worked in the home of the parties and 1 had worked in the home of the husband's mother. All 3 testified that they had never heard the wife say anything, or seen her do anything, to try in any way to prejudice her daughters against her husband. A similar statement was made by a neighbor who saw a lot of the Irvine family. The fifth witness on plaintiff's behalf was not examined or cross-examined in this regard. The wife called 2 witnesses, both of whom had been employed in the home, and they made similar statements. There was a total absence of proof by anyone (except inference drawn by the husband from minor incidents) to sus-

tain his claim that his wife had influenced his children against him.

This Court has repeatedly stated that it recognizes the advantage of the trial court in seeing and hearing the witnesses and that the judgment of the trial court will not be reversed unless the record fails to sustain same. The record in this case discloses that the trial court was very patient during the 4 days of trial, giving to both parties full opportunity to introduce proof, and that when proofs were closed, the court, with permission of husband and wife, conferred with the 2 daughters. Thereafter the court stated:

"The proofs have been closed and we have had the arguments of counsel, and I would like to have the record show that since the arguments of counsel I have talked to each of the parties separately in the judge's office as a final effort to see if there isn't a possibility of a reconciliation. It doesn't seem to be possible just at this time, so I will have to take the case under advisement."

On February 27, 1953, the circuit judge wrote a letter to counsel for the respective parties and this letter is incorporated in the record. In this letter the judge stated that he realized that: "The opinion quite likely will not satisfy either party. But I want to assure you that I have studied the matter carefully and have reviewed all of my notes and the pleadings, and the statute and decisions, and in my judgment this is the best solution, hoping that the parties may become reconciled before too long." The judge further stated: "It is not my idea to *force* the children to go with the father, but he should have the *right* to have them."

In the opinion, which was enclosed with the letter, the judge stated:

"The difficulty between the parties centers largely around the divergent ideas of the parties with reference to the discipline of their 2 children, girls, 11 and 12 years old. The children appear to have lost their affection for the father."

We agree with the court's opinion that in regard to the husband's grounds for divorce his "complaints are more imaginary than real," and that the record does not sustain the husband's contention that his wife influenced his children against him.

Question 5. "Was plaintiff guilty of nonsupport?"

Between July 31, 1951, the day the husband left his home, and January 1, 1952, he paid nothing toward the support of his wife or children. In November, 1951, the wife responded to a letter she received from her husband's lawyer requesting her to come to his office. She testified that she went because she had no money to pay for household expenses. His lawyer informed her that his client would provide money for a vacation for her while the husband remained at home with the children. She testified:

"I said I thought it was a polite form of blackmail and they weren't for sale, and I walked out and went over to the bank and borrowed some money."

Early in January, 1952, the husband returned to the home for 2 weeks. An itemized statement kept for 2 years disclosed that bills for household expenses, such as help and groceries, amounted to $800 per month, and plaintiff agreed that from then on he would give his wife $800 per month and that he would continue, as in the past, paying bills for all standard expenses (milk, laundry, garbage, et cetera). He also agreed to pay and did pay expenses incurred between the time he left in July, 1951, and his return in January, 1952. This agreement was carried out by payments of $800 on March 1, April 1, and May 1, 1952. The husband filed his bill for

separate maintenance on May 26, 1952, and he testified:

"After filing suit I quit. I haven't paid her anything in cash since."

The record discloses that between May 1, 1952, when husband made his last payment of $800, and December 13, 1952, (3 days before trial) the husband ·paid household bills of $5,598.50. The exact date of payment of these bills is left in doubt by the record and what bills were paid is not disclosed. The wife's testimony that this payment was not sufficient to compensate her for expenses incurred was not refuted, and is as follows:

"I haven't had any money from him since the 1st of May, 1952. I had to do the same thing that I had to do the fall before. I had to go back to the bank and take my Saniwax stock and put it up as collateral and borrow money. I owe the bank $4,000 for that, and when this began I had personally $3,500 of my own. That is all gone down the same drain too. That begun when Stu left home the original time, July 31, 1951. That is all gone."

Appellant calls attention to the provision of the statute (CL 1948, § 552.301 [Stat Ann § 25.211]) that the wife must prove that the husband, without good and sufficient cause, being of sufficient ability to support her, deserted her. We believe the record proves the fact of desertion, and the husband's ability to support is shown by the testimony of the husband who stated that his salary for 1952 would be about $40,000, and that his assets totalled over $300,-000. The court in its opinion stated:

"The parties are highly respected in the community and have lived very comfortably. Plaintiff's income, after taxes, has averaged approximately $22,-500 over the last 5 years. Their difficulty is not due

·to a lack of money, but on the contrary, probably due in part to too much money."

Appellant contends there is a lack of proof required by the statute, namely, that the husband refused and neglected to support his wife. We believe the record proves beyond a doubt that the husband was guilty of refusal and neglect to support his wife between July 31, 1951, and January, 1952. The husband's delayed payment in January would not eliminate that fact. The husband admits that his January, 1952, agreement to pay his wife $800 per month was broken by him the following May.

The record proves that for an extended period of time between May, 1952, up to perhaps 3 days before the start of the trial, the husband was again guilty of refusal and neglect to support his wife. The payment of $5,598.50 of bills did not constitute proof of full payment and did not eliminate the fact that the husband had refused and neglected to support his wife for several months before the trial.

Another fact which we believe sustains the court's determination that the wife was entitled to separate maintenance because of husband's failure to recognize his duty to support her was his expressed attitude toward this responsibility from the time he started his action in May, 1952, to the time of trial in December, 1952. He clearly, by action and word, proved both before the trial and at the trial that he could not and would not live at home with his wife and children. His payment for the support of them would be made only upon his terms, namely:

1. His wife's admission that she was responsible for the children's lack of love for him;

2. That the wife agree that he be given custody of the children "with such custody to continue for such period of time as is reasonably necessary to correct the present feelings and attitude of the children toward the plaintiff and to replace the same with

normal feelings of love and affection which should exist between children and their father;

3. "That such custody include the privilege of use of the family home at 169 South Prospect street in the city of Kalamazoo, Michigan, by plaintiff and the children, with defendant being afforded opportunity to accept offers previously made and still available to provide extended vacation at plaintiff's expense for both herself and her mother, thereby affording to plaintiff reasonable opportunity for accomplishment of desired results."

This does not in our opinion constitute support as provided in the separate maintenance statute, and the record sustains the wife's refusal to agree to such terms in order to obtain any support from her husband.

We agree with the court's decision that the wife should be granted separate maintenance and custody of the children and that the plaintiff should pay for the support and maintenance of defendant and the children the sum of $1,000 per month, beginning as of December 13, 1952, this in addition to the use of the house in which the defendant and children were living at the time of the hearing in court. Also, plaintiff should pay for necessary medical and/or hospital expenses for defendant and the children. The decree should provide that the court retain jurisdiction to administer and enforce the decree, and to modify same upon a change of circumstances.

Decree affirmed. The cause is remanded to the trial court for the carrying out and enforcement of the terms of said decree. Costs to defendant and appellee.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred with KELLY, J.

DETHMERS, J., concurred in the result.